(No. 26472.—
JAMES C. HOSKINS, Appellee, *vs.* CHICAGO PARK DISTRICT, Appellant.

*Opinion filed May 13, 1942—Rehearing denied September 16, 1942.*

Murphy, C. J., and Shaw, J., specially concurring.

John O. Rees, and Winston, Strawn & Shaw, (Silas H. Strawn, Ralph M. Shaw, John D. Black, Martin G. Loeff, Harry P. Hensel, and Frank H. Towner, of counsel,) for appellant.

Frederick C. Jonas, for appellee.

Mr. Justice Wilson delivered the opinion of the court:

This cause is here on leave to appeal granted to review the judgment of the Appellate Court for the First District, reversing a decree of the superior court of Cook county in an action wherein the plaintiff sought a mandatory injunction to compel the removal of certain railings and pilasters along the west side of a bridge forming a part of the Outer Drive in Chicago, so as to permit him to have access to the drive from his proposed building. Defendant, the Chicago Park District, answered that it is not required to remove these railings and that since the bridge forms a part of a park driveway or boulevard the plaintiff is not entitled to access to it from his property. The case was referred to a master in chancery who heard the evidence, filed his report and found, *inter alia,* that plaintiff was guilty of *laches* in failing to bring his action while the ap-

proach and bridge were in the course of construction, and recommended the suit be dismissed for want of equity. After exceptions were overruled, a decree was entered substantially in accordance with the recommendation of the master.

This bridge and its approaches are a part of the driveway or boulevard known as the Outer Drive. The stated purpose of its construction was to connect the parks and boulevards then under the jurisdiction of the Commissioners of Lincoln Park with those under the jurisdiction of the South Park Commissioners. Defendant is the successor to these park districts by consolidation. (*Kocsis* v. *Chicago Park District*, 362 Ill. 24.) The bridge is an eight-lane roadway for vehicular traffic, originating at the intersection of Lake Shore Drive and Ohio street on the north, crossing the Chicago river and meeting the Outer Drive of Grant and Burnham parks at Monroe street. The viaduct consists of a ramp, gradually rising until it reaches thirty-eight feet in height above the Chicago river at the point of crossing the stream. After crossing the river it declines until it reaches the level of Monroe street. Its total length is somewhat less than a mile. Defendant constructed on each side, and as a railing of the viaduct, ornamental balustrades, railings and pilasters. At either side a plaza was worked into the bridge in the form of a half-circle, substantially widening it at this point. Work of installing the pilasters, balustrades and other ornamentations was started in the early part of September, 1937, and completed within two weeks thereafter. The bridge was dedicated and opened . up to the public October 5, 1937.

The project, as far as pertinent, was put in motion February 14, 1929, when the commissioners of Lincoln Park adopted a resolution to construct one-half a bridge across the Chicago river and approaches to the north end thereof. Condemnation proceedings were commenced in the circuit court for the purpose of acquiring the real estate

necessary. The Chicago Dock and Canal Company owned the real estate extending north from the north bank of the Chicago river to East Grand avenue, including the premises occupied by plaintiff as its lessee as well as the property occupied by the North Pier Terminal Warehouse, located on the approach to the bridge, approximately 100 feet north of plaintiff's property. Plaintiff's premises extend from a point approximately 450 feet west of the bridge to a point about 375 feet east thereof and abut upon East North Water street, a dedicated public street in Chicago. The bridge extends north and south. Prior to the bridge construction, plaintiff's access to these premises was over East North Water street which access was not affected nor diminished by the construction of the bridge. In fact, two stairways have been installed,—one on each side of the bridge north of the river, leading from the bridge level down to ground level, which afford an access to plaintiff's premises which did not exist prior to the bridge construction. Plaintiff's proposed building was to abut partly on the west side of the viaduct roadway and partly along the northwest side of the plaza. When completed, it was designed to extend two stories above the Outer Drive viaduct level and to be supported by a number of pillars or posts extending from the ground to the height of the viaduct. The first floor was to be level with the traveled portion of the viaduct, approximately thirty-eight feet above the ground.

July 25, 1929, concurrently with the entry of the judgment in the condemnation action, a contract and stipulation were entered into by the commissioners of Lincoln Park and the Chicago Dock and Canal Company pertaining to the real estate and air rights required, at which time comprehensive plans of the proposed Outer Driveway were in existence. One of the provisions of the agreement was that in order to build the Driveway across the site occupied by the Terminal Warehouse the Dock company would, with-

out cost or expense to the Park District, permanently remove the five stories which lay above the second floor line of the Terminal Building for a distance of 139 feet, measured from east to west, being the proposed width of the Driveway. The Park District, in turn, obligated itself to make repairs and reconstruct the terminal building, including finishing the fronts of the buildings on either side of the viaduct which remained standing after the removal of the section necessary to accommodate the driveway. No balustrades or railings were constructed in front of these refinished buildings, and both buildings have ingress and egress from the Outer Driveway viaduct. The Dock company expressly retained title in fee simple to all parts or portions of real estate and improvements thereon, not actually filled with portions of said viaduct, columns, column foundations, enclosure walls and piers, and when construction was completed it was agreed the Dock company would have the right at any time to hang, attach or support overhead piping, cables, conduits or other equipment or appliances to the underside of said viaduct insofar as it did not interfere with safe loads for which the viaduct was designed. It was further agreed that the column foundations of the terminal building were to be used jointly as supports for the Outer Driveway viaduct and the warehouse. The Dock company agreed to sell to the Park Commissioners all of the real estate and air rights required for this Outer Drive for the sum of $1,333,712, and the further sum of $166,288 was agreed to be paid to the Dock company for damages to the remainder of its property, making an aggregate sum paid to it of $1,500,000. A deed dated July 25, 1929, conveyed to the Park District title in fee simple to the part of the premises where the pillars and supports of the viaduct were erected, and the air rights over the tract covered by the viaduct. The deed contained no reservation of any easement for light, air, ingress or egress. Nor did the agreement or the deed make any provision for the

subsequent erection of any building which was to be provided with ingress to and egress from the viaduct. On July 25, 1929, the judgment confirming the provisions of the contract and stipulation was entered by the circuit court of Cook county.

Plaintiff's present lease, extending from June 1, 1935, to April 30, 1945, did not take effect until approximately six years after the settlement consummated between the Lincoln Park District and his lessor, and that settlement, and the judgment entered contemporaneously therewith, is binding upon plaintiff's lessor. Obviously, therefore, it is binding upon plaintiff, because, as lessee, he acquired no greater rights than his lessor and he took the property as he found it. As we stated in the analogous case of *Siegel* v. *City of Chicago,* 325 Ill. 88: "Appellee had actual notice of the proposed improvement before it entered into the lease, and if it did not know the nature and character of the improvement it could have ascertained by reasonable investigation before leasing the premises. Very little inquiry would have disclosed the character of the improvement and its effect upon appellee's leasehold."

During the period between June and September, 1937, plaintiff and his architect had several conversations with the general superintendent and chief engineer of defendant, in the course of which defendant's superintendent was advised of plaintiff's plan to erect a building on the premises occupied by him, and the superintendent delivered plans of the north plaza of the bridge to plaintiff's architect. The superintendent testified that he told plaintiff that he, as superintendent of the Park District, had no authority to pass upon the question of ingress and egress raised by plaintiff, but that it would be necessary to take it up with the commissioners of the Park District. Following the issuance in November, 1937, by the city of Chicago of a building permit, and without further consultations or notice to defendant, plaintiff commenced erection of his building,

continuing work thereon from November, 1937, until February, 1938, at which time the footings and steel work had been completed. The first floor level of the building is flush with the sidewalk on the west side of the bridge, and it is built to follow the contour of the bridge. Plaintiff has expended about $15,000 so far on the building, and its total cost, when complete, is estimated at $60,000 to $65,000. Construction was stopped because the railings and ornamentations on the bridge prevented access to the bridge from the building and because plaintiff was unable to secure their removal. Plaintiff intends to erect a sign and to use the building for office and administration purposes and for the display of his goods. On October 7, 1938, plaintiff served upon defendant a written demand for the removal of the railings and other ornamentations claimed to obstruct access to the bridge from the building. Defendant not having complied with this demand, plaintiff commenced this action. As now constructed, the bridge is a high-speed traffic artery connecting the parks and boulevards north of the Chicago river with those south of the river. No buildings face upon it except the two north of the river and, except in front of these buildings, it is lined throughout its entire length by ornamental balustrades and ornamentations. After the work on plaintiff's building was stopped no further action was taken by him until October 19, 1938, when the complaint was filed in this cause. During the entire period, up to the date of the filing of said complaint, no demand or protest was made by the plaintiff or his agents, with the exception of said communication of October 7, 1938.

It thus appears that the plans for the bridge and its approaches had been completed in 1929, and the necessary materials ordered prior to the summer of 1937, and notwithstanding the occupancy by plaintiff of premises on both sides of the viaduct all the time during which negotiations had been conducted and carried into fruition the first knowledge defendant's officials had of plaintiff's pro-

posed building was in June, 1937, at which time they turned over to his architect a set of plans for the part of the bridge contiguous to his building. Plaintiff was informed by defendant's superintendent that any change in design of the bridge pertaining to ingress or egress thereto from his building was a matter to be taken up with the commissioners of the Chicago Park District which he, as superintendent, was without power to decide. However, plaintiff stood by and took no effective action by way of injunction or otherwise to prevent the installation of these railings, balustrades, and other ornamentations, or to effect a change in design of the bridge prior to their installation. The uncontroverted evidence showed the cost of installing the railings, pilasters and other ornamentations which plaintiff now desires removed was $19,885.90. In addition, the cost of removal would require an expenditure of $2771. It would be contrary to equity to thus penalize defendant. It also appears plaintiff proceeded with the erection of his building subsequent to the completion and dedication of the bridge and it was not until October 7, 1938, more than a year afterwards that a proper demand was made upon defendant. Shortly thereafter, this action was commenced.

The Chicago Park District contends that the Outer Drive bridge with its approaches being part of the park system administered by defendant is not a public street or highway to which owners of abutting property have the right of ingress and egress, and further urges that plaintiff, because of *laches*, is not entitled to any relief. Upon the condition of the record as recounted, in addition to being bound by the agreements entered into between plaintiff's lessor and defendant's predecessor, culminating in a judgment in the condemnation proceeding and warranty deed executed by Chicago Dock and Canal Company, we are of the opinion that the plaintiff was guilty of *laches* as found by the master and confirmed by the chancellor. The decision of this court in *Carstens* v. *City of Wood River,*

344 Ill. 319, is quite analogous to the situation involved herein. In that case, a mandatory injunction was sought demanding the removal of a swimming pool and other structures in a park maintained by the defendant municipality. The pool and bath house were constructed in the spring of 1926, opened for public use July 4, 1926, and in continuous operation until after Labor Day of that year. Thereafter plaintiff filed his bill. The evidence disclosed that before the construction plaintiff had been shown blueprints, had full knowledge of the improvement and had appeared before the city council and stated he had legal advice to the effect he could prevent the improvements and would do so. No effective action was taken however until after the completion of the structure at an expense of $100,000 and it had been in use for about three months before he filed his bill. We there stated: "One who seeks equitable relief against interference with an easement must act with reasonable promptness after learning of the proposed violation of his rights and cannot stand idly by and permit the structures complained of to be completed at large cost without objecting. Equity, in all cases where a mandatory injunction is sought, will strictly require that the application for relief be promptly made, and a failure to assert such right, without sufficient excuse therefor, until after large expenditure of moneys, operates as a bar to relief in a court of equity. [Citations.] No reason is advanced for the failure of appellant to file a bill prior to or during the building of the swimming pool and buildings complained of. A mere threat is not sufficient." *Brandenburg* v. *Country Club Building Corp.* 332 Ill. 136, is to the same effect.

Plaintiff has advanced other points in an effort to sustain the judgment of the Appellate Court, stressing particularly his contention that the viaduct and bridge in question constituted a public highway and that he, as an abutting property holder, had the right to ingress and egress thereto.

The view we have taken that plaintiff is bound by the settlement consummated by his lessor and the Park District, and that plaintiff's *laches* is a bar to the granting of the relief asked by him, renders unnecessary a consideration and determination of the additional points urged.

The judgment of the Appellate Court is reversed and the decree of the superior court is affirmed.

*Judgment of Appellate Court reversed;*
*decree of superior court affirmed.*

MURPHY, C.J., and SHAW, J., specially concurring.